UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

No. 1:26-cv-02216

**Bon Appetit Danish Inc.,**
*Plaintiff,*
v.
**Real Appetit LLC, et al.,**
*Defendants.*

## MEMORANDUM OPINION AND ORDER

Plaintiff Bon Appetit Danish Inc. ("Bon Appetit") requests a preliminary injunction restraining Real Appetit LLC and two of its members ("Defendants") from using the name "REAL APPETIT" or certain packaging design to sell their retail bakery goods. Plaintiff is likely to succeed on the merits of its claim that Defendants are infringing on its trade dress—*i.e.*, the packaging of the baked goods. Defendants' trade dress is a dead ringer for Plaintiff's, such that consumers would likely be confused about who made the baked goods to begin with. But Plaintiff has not made the same showing for its trademark infringement claim. The trademarks are not as likely to sow confusion because their phrasing is different, and Defendants distinguish their mark with a picture of the U.S. Capitol Building on it. Plaintiff is likely to succeed on the remaining factors for a preliminary injunction for its trade dress claim. The motion is therefore granted in part and denied in part. Defendants are enjoined from using Plaintiff's trade dress but not from using the name "REAL APPETIT."

## Background

Plaintiff Bon Appetit has sold packaged pastries to retailers since the mid-1980s. In the 1990s, Bon Appetit secured federal trademarks from the United States Patent & Trademark Office ("USPTO") for the phrases "BON APPETIT" and "BUON APPETITO," with respect to danishes, cakes, muffin pastries, and similar baked goods in International Class 30 ("IC 30") which is the USPTO designation for staple and plant-based food products. Mot. for Prelim. Inj. ("Mot.") at 1–2 (ECF No. 4). Bon Appetit has spent millions of dollars to promote its baked goods using those trademarks in over 60,000 retail stores nationwide. *Id.* at 2; Compl. at ¶¶ 18, 19 (ECF No. 1).

Defendants Ghulam and Flores formed Defendant Real Appetit LLC in December 2024 selling similar baked goods to Bon Appetit. In August 2026, the USPTO approved Real Appetit's federal trademark for the phrase "REAL APPETIT" covering bakery goods in IC 30. Its mark includes a sketch of the U.S. Capitol Building appearing above that phrase. Resp. to Mot. for Prelim. Inj. ("Resp.") at 5 (ECF No. 21); REAL APPETIT, Registration No. 8,398,909. Here is a side-by-side comparison of each party's trademark:

<table>
<tr><th>Plaintiff's Trademark</th><th>Defendants' Trademark</th></tr>
<tr><td>BON APPETIT<br>BUON APPETITO</td><td rowspan="2">
</td></tr>
<tr><td>Bon Appetit®</td></tr>
</table>

(Exhibit 1)

The parties' products also have "trade dress," *i.e.*, the distinctive packaging for its products. Bon Appetit's trade dress for its baked goods typically includes a printed label placed on clear plastic wrapping. *See* Mot. at 5–6. The printed label is usually small enough so that the baked good is visible from the clear plastic wrapping. *See id.* The Bon Appetit labels have a color scheme that typically matches or complements the real color of the baked good, are proportional in size across various goods, are similarly placed on the packaging, and feature a vintage, slightly cartoonish illustration of the baked good. *See id.* Real Appetit likewise sells pastries encased in clear plastic and affixed with a label that includes its trademark. *See id*.

Neither party has registered their product's trade dress with the USPTO. The following exhibit depicts examples of each party's trade dress:

| Plaintiff's Trade Dress | Defendants' Trade Dress |
| --- | --- |
| Pound Cake | |
|   |  |
| Blueberry Muffin | |
|   |  |

(Exhibit 2)

Bon Appetit's counsel sent a cease-and-desist letter to Real Appetit in May 2026, demanding that Real Appetit cease all use of the Real Appetit name, mark, trade dress and branding. *Id.* at 6. Real Appetit refused. On August 12, 2026, Bon Appetit brought this action against Defendants and filed a motion for a preliminary injunction.

Bon Appetit brought claims for federal trademark infringement, federal trade dress infringement, false designation of origin and unfair competition, as well as multiple related claims under Texas law. In its preliminary injunction motion, Bon Appetit requests that the Court enjoin Real Appetit and all persons acting in concert with it from "using REAL APPETIT or any confusingly similar mark and from using trade dress confusingly similar to Bon Appetit's trade dress, in connection with baked goods or related products." *Id.* at 16. Defendants Ghulam and Flores filed a *pro se* response.[1]

The Court now takes up the motion for a preliminary injunction.

---

[1] Defendant Real Appetit joined Defendants Ghulam and Flores' response, but the Court struck Real Appetit's response because Real Appetit is a corporate entity and thus cannot proceed *pro se* in this action. *See* ECF No. 20; Text Order Denying ECF No. 16. The Court, however, can grant a preliminary injunction against a defendant who has not responded if it had notice. *See* FED. R. CIV. P. 65(a)(1); *Harris County v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 325–26 (5th Cir. 1999). Real Appetit had notice because it was served and because Defendants Ghulam and Flores have notice as the managing members of Real Appetit. ECF Nos. 11, 16. Any relief granted against Defendants Ghulam and Flores will thus be granted against Defendant Real Appetit.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). "[A] plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U.S. at 20)). The plaintiff bears the burden of proving each element. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

"The first factor—likelihood of success on the merits—is 'the most important.'" *United States v. Abbott*, 110 F.4th 700, 706 (5th Cir. 2024) (en banc) (quoting *Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023)). "To assess the likelihood of success on the merits, [courts] look to 'standards provided by the substantive law.'" *Janvey*, 647 F.3d at 596 (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). Against those standards, the plaintiff must present a prima facie case, but "is not required to prove [his] entitlement to summary judgment." *Id.* at 595–96 (alteration in original) (citation omitted). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "[G]iven the haste that is often necessary if those positions are to be preserved," the Court assesses the merits "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.*

## Analysis

Plaintiff's request for a preliminary injunction is predicated on its claims for trademark and trade dress infringement under the Lanham Act. Plaintiff is likely to succeed on the merits of its claim for trade dress infringement but not on its claim for trademark infringement at this stage. On its trade dress infringement claim, Plaintiff makes a sufficient showing of irreparable harm, and the equities balance in its favor as does the public interest factor. Plaintiff's motion for a preliminary injunction is therefore granted to enjoin further trade dress infringement but is denied as to trademark infringement.

### I. Likelihood of success on the merits

Plaintiff is likely to prevail on its claim for trade dress infringement, but not on its claim for trademark infringement. The Fifth Circuit "appl[ies] the same analysis [] to a claim for trade dress infringement as [it does] to a claim for trademark infringement." *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*, 80 F.4th 536, 544 n.2 (5th Cir. 2023) (citing *Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989)). To prevail on either claim, a party must show that: "(1) its trade dress [or trademark] qualifies for protection; and (2) the trade dress [or trademark] has been infringed by demonstrating a likelihood of confusion in the minds of potential consumers." *Beatriz Ball, L.L.C. v. Barbagallo Co.*, 40 F.4th 308, 316–17 (5th Cir. 2022) (per curiam); *Whirlpool*, 80 F.4th at 544 n.2. Plaintiff is likely to succeed at step one for both claims. At step two, however, Plaintiff is likely to succeed only on its claim for trade dress infringement.

**A. Plaintiff has not demonstrated a likelihood of success on the merits of its trademark claim.**

"To be protectable, a [trade]mark must be distinctive, either inherently or by achieving secondary meaning in the mind of the public." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008) (citation omitted). "[R]egistered [trade]marks which have become 'incontestable' under the Lanham Act . . . are protected from challenge by a presumption of validity." *Union Nat'l Bank of Texas, Laredo, Tex. v. Union Nat'l Bank of Texas, Austin, Tex.*, 909 F.2d 839, 842 n.6 (5th Cir. 1990); *Nola Spice Designs, L.L.C. v. Haydel Enters.*, 783 F.3d 527, 537 (5th Cir. 2015) (holding that registration "is prima facie evidence that the marks are inherently distinctive"). Plaintiff's trademarks are incontestable and thus protectable. Mot. at 1–2. Although Defendants also possess a registered trademark, "[t]he first one to use a mark is generally held to be the 'senior' user and is entitled to enjoin other 'junior' users from using the mark, or one that is deceptively similar to it[.]" *Union Nat'l Bank*, 909 F.2d at 842–43.

The question then is whether there is a likelihood of confusion in the minds of potential consumers. "To establish a likelihood of confusion," the plaintiff "must show 'a probability of confusion, which is more than a mere possibility of confusion.'" *Viacom Int'l v. IJR Cap. Invs.*, 891 F.3d 178, 192 (5th Cir. 2018) (quoting *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998)). "Although evidence of actual confusion on the part of consumers 'is patently the best evidence of likelihood of confusion' . . . it is not necessary to demonstrate actual confusion in order to prevail[.]" *Allied Mtkg. Grp. v. CDL Mktg., Inc.*, 878 F.2d 806, 813 (5th Cir. 1989) (quoting *Chevron Chem. Co. v. Voluntary Purchasing Grps.*, 669 F.2d 695, 704 (5th Cir. Unit A Oct. 1981), *cert. denied*, 457 U.S. 1126 (1982)).

For trade dress and trademark infringement, "likelihood of confusion may be determined by considering a number of factors or 'digits' of confusion[.]" *Id.* Those are "[1] similarity of [the] products, [2] identity of retail outlets and purchasers, [3] identity of advertising media, [4] type (i.e., strength) of trademark or trade dress, [5] defendant's intent, [6] similarity of design, [7] actual confusion," and "[8] degree of care exercised by purchasers[.]" *Blue Bell Bio-Medical*, 864 F.2d at 1260 (citation omitted); *see also Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008) (repeating the same factors). And "the absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported even by a majority of the factors." *All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 508–09 (5th Cir. 2018) (cleaned up). The factors do not support a finding of confusion for Plaintiff's trademark infringement claim.

The first factor weighs in favor of Plaintiff because its products are nearly identical to Defendants' products. *Compare Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980) (finding the first factor satisfied where two companies sold similar car care services), *with Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 261 (5th Cir. 1980) (finding minimal similarity between a company that sold pizzas and one that sold condiments). Plaintiff's trademark covers danishes, cakes, and muffin pastries, and it sells individually wrapped baked goods including muffins, cakes, pastries, and sweet rolls. Mot. at 12. Defendants sell—and their trademark covers—bakery products including bread, pastries, cakes, cupcakes and other similar goods. Resp. at 5.

The second factor also weighs in favor of Plaintiff. This factor asks whether consumers can distinguish between the products based on *where* they are sold. *See Exxon Corp.*, 628

F.2d at 505–06. Plaintiff distributes its products in convenience stores, grocery retailers, and gas stations. Mot. at 12. Defendants purport to deny that their products are sold through identical channels of trade. Answer at 24 (ECF No. 23). But they elsewhere concede the opposite. In their answer, for example, Defendants acknowledge that "there are dozens of products at convenience stores using identical trade channels without causing confusion," implying it uses those same channels. *Id.* Indeed, Defendants' argument is that, *despite similar channels*, a finding of confusion is still unwarranted. But the relevant question in this factor is simply whether the channels are similar, not whether that finding alone is sufficient to establish confusion.

The third factor is neutral because Plaintiff produces no evidence of its advertising media.

The fourth factor—strength of the trademark—weighs slightly against Plaintiff. The Fifth Circuit "consider[s] two factors when assessing the strength of a mark: (1) 'where the mark falls on a spectrum' of distinctiveness, and (2) the mark's standing in the marketplace." *Casa Tradición S.A. de C.V. v. Casa Azul Spirits, L.L.C.*, __ F.4th __, 2026 WL 3334647, at *3 (5th Cir. Nov. 4, 2026) (quoting *All. For Good Gov't*, 901 F.3d at 509). Neither party clearly applied either of these standards in their briefing. Defendants nevertheless establish that more than one hundred food distributors have trademarks for the words "BON" or "APPETIT," or some similar combination thereof for goods in IC 30. *See* Answer, Ex. A at 1–9. "Extensive third-party use can weaken a mark and negate a likelihood of confusion," especially where companies making similar use of a mark "fall within the same category of [business] as the plaintiff." *Smack Apparel*, 550 F.3d at 479 (cleaned up); *see also Casa Tradición*, 2026 WL 3334647, at *8 (explaining that the third-party use analysis focuses on the

senior user's mark). Indeed, many of the registered third-party trademarks that Defendants present are for baked goods or closely related goods in IC 30. Plaintiff responds that its trademark is strong because it is incontestable, and because of its sales volume and marketing efforts. *See Am. Rice*, 518 F.3d at 330–31 (analyzing the marketplace standing of an incontestable mark with "strong established secondary meaning in the market"); *Casa Tradición*, 2026 WL 3334647, at *6–7 (evaluating the marketplace standing of a mark with "widespread exposure to and recognition by consumers"). The evidence on this factor is thus close, and the Court concludes that it weighs only slightly against Plaintiff.

The fifth factor "focuses on whether the defendant intended to derive benefits from the reputation of the plaintiff." *Streamline Prod. Sys. v. Streamline Mfg.*, 851 F.3d 440, 455 (5th Cir. 2017). Plaintiff presents no direct evidence of Defendants' intent to copy its trademarks. It simply states that Defendants "adopted . . . a confusingly similar name," and "refused to cease use of the[ir] mark" after Plaintiff sent its cease-and-desist letter. Mot. at 13–14. "But mere awareness of the senior user's mark does not establish bad intent." *Streamline Prod.*, 851 F.3d at 456 (cleaned up); *see Bulbs 4 E. Side, Inc. v. Ricks*, 199 F. Supp. 3d 1151, 1162 (S.D. Tex. 2016) (finding that the intent factor did not weigh in favor of confusion even where junior user had knowledge of the senior user's similar mark). This factor is thus neutral. *See Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 296 (5th Cir. 2020) ("[A]n absence of intent renders that [factor] neutral.").

The sixth factor—similarity of design—is also close. The similarity between two trademarks "requires consideration of the mark's appearance, sound, and meaning." *Smack Apparel*, 550 F.3d at 479 (citation omitted). "'Similarity of appearance is determined on the basis of the total effect of the design[],

rather than on a comparison of individual features,' but 'courts should give more attention to the dominant features of a mark.'" *Rex Real Est. I, L.P. v. Rex Real Est. Exch.*, 80 F.4th 607, 622 (5th Cir. 2023) (quoting *Xtreme Lashes, L.L.C. v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009)). Plaintiff and Defendants' marks share a single word, "appetit." But "appetit" is the more dominant word which can support a finding of similarity especially when "the additional words in each mark are more generic." *Streamline Prod.*, 851 F.3d at 454. Whether the additional words "bon" and "real" create a meaningful distinction is a close question. *See id.* (citing *Xtreme Lashes*, 576 F.3d at 228 (finding similarity between two marks that "did not share any common words, [but] had a minor aural similarity when spoken aloud." (cleaned up)). Defendants use a different font and color in their labeling, and most importantly, Defendants' logo includes a large black and white silhouette of the U.S. Capitol Building above "REAL APPETIT," whereas Plaintiff's logo uses an angled, bright-red cooking lid. The trademarks are thus distinct enough to caution against a strong finding of similarity at this stage. *Cf. id.* (finding similarity where both trademarks were used in the similar context of the parties' respective logos, but also used the same imagery and color scheme). This factor thus weighs in favor of neither party.

The seventh factor is neutral because Plaintiff presents no evidence of actual confusion. *See Smack Apparel*, 550 F.3d at 483; *see also Rex Real Est.*, 80 F.4th at 623–27 (surveying Circuit caselaw on this factor).

The eighth factor—degree of consumer care—weighs in favor of Plaintiff. "Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Smack Apparel*, 550 F.3d at 483. The parties sell cheap grab-and-go pastries. That is the

quintessential example of an inexpensive low-care good. *See id.* (upholding district court finding that $18 shirts satisfied the eighth factor); *cf. Streamline Prod.*, 851 F.3d at 458 (finding that eighth factor weighed against confusion where the target consumers "were large companies purchasing very expensive, custom made equipment").

Considering the totality of the circumstances and after weighing all the factors, the Court finds that Plaintiff has not made a clear showing that Defendants' trademark is likely to cause confusion. *See Future Proof Brands*, 982 F.3d at 298 (upholding district court finding of no confusion when "three [factors] supported the injunction and one weighed marginally in favor," but "the other four factors," including actual confusion and intent, "did not support the injunction" (cleaned up)); *see also id.* at 289 (explaining that the "intent" and "actual confusion" factors, both of which are absent here, possess "particular prominence").

**B. Plaintiff has established a likelihood of success on the merits of its trade dress claim.**

The Court next examines trade dress. Unregistered trade dress qualifies for protection if it is nonfunctional and distinctive. *Test Masters Educ. Servs.v. State Farm Lloyds*, 791 F.3d 561, 565 (5th Cir. 2015). The Supreme Court uses two tests to determine whether trade dress is nonfunctional and Plaintiff's dress survives both. *See Whirlpool*, 80 F.4th at 544.

The first test maintains that "a product feature is functional, and cannot serve as a trade[ dress], if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (cleaned up)). Defendants argue that Plaintiff's trade dress is functional because its clear plastic packaging showcases product freshness. Answer at 22.

But Plaintiff does not object to Defendants using clear plastic packaging per se. Rather, Plaintiff objects to Defendants using its trade dress which is the "*combination* of packaging features that creates a distinctive commercial impression." Mot. at 10 (emphasis added). Particular combinations of packaging features are not "essential to the use or purpose" of bakery goods—the essential purpose of the good is to be consumed. *See Whirlpool*, 80 F.4th at 544 (finding that trade dress was non-functional under this test where "nothing in the record demonstrate[d] that the exterior styling of the [product was] the reason the [product] work[ed]" (cleaned up)). Nor does Plaintiff's trade dress affect the cost or quality of the actual bakery goods in a meaningful way. There are multiple competing products on the market that use notably distinct packaging to make their bakery goods commercially presentable. *See* Mot. at 8. And as other courts have held, "design elements [that] serve an ornamental purpose" do not generally "affect the cost or quality" of the encased product. *Berg v. Symons*, 393 F. Supp. 2d 525, 556 (S.D. Tex. 2005); *see also In re Stoli Grp. (USA) LLC*, No. 24-80146-swe-11, 2026 WL 575084, at *8 (Bankr. N.D. Tex. Feb. 27, 2026) (finding that the food product "TABASCO's" trade dress was non-functional where it "serve[d] no purpose apart from distinguishing the Plaintiff's products from those of its competitors," and also where "[m]any other designs exist for competitors to use"). Plaintiff's trade dress is thus non-functional under the first test.

The second test "looks less to use, and more to competition, stating that 'a functional feature is one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage.'" *Whirlpool*, 80 F.4th at 544 (quoting *Smack Apparel*, 550 F.3d at 486). "But again, the presence of competing products with other design motifs cuts against" a finding that the trade dress is functional even when other

designs are "potentially less desirable or aesthetically pleasing." *Id.* There is little question that Plaintiff's competitors use different packaging designs that are viable let alone less aesthetically pleasing. *See* Mot. at 8. Plaintiff's trade dress satisfies the second test, and is thus nonfunctional.

Unregistered trade dress "is distinctive, and therefore protectible, only upon a showing of secondary meaning.'" *Beatriz Ball*, 40 F.4th at 317 (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000)). Some courts conduct the distinctiveness inquiry by analyzing whether the trade dress is "inherently distinctive" using the *Abercrombie* test. *Pengu Swim Sch., LLC v. Blue Legend, LLC*, No. 4:21-cv-1525, 2023 WL 3044607, at *4 (S.D. Tex. Apr. 21, 2023). But this "inherently distinctive" test is generally—though not exclusively—limited to the context of marks consisting of words," and Plaintiff does not raise the issue. *Id.* at *6 (citing *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 240 (5th Cir. 2010) (discussing Judge Henry J. Friendly's seminal decision in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976))). The Court therefore only considers whether Plaintiff's trade dress has secondary meaning.

"Secondary meaning is established when, 'in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.'" *Beatriz Ball*, 40 F.4th at 317 (quoting *Wal-Mart Stores*, 529 U.S. at 211). The Fifth Circuit uses seven factors to determine whether the trade dress has taken on secondary meaning: "(1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress." *Id.* (quoting *Amazing Spaces*, 608 F.3d at 248). "[W]hether a mark

or dress has acquired secondary meaning is primarily an empirical inquiry." *Id.* (quoting *Amazing Spaces*, 608 F.3d at 248). "While none of these factors alone will prove secondary meaning, in combination they may establish the necessary link in the minds of consumers between a product and its source." *Nola Spice Designs*, 783 F.3d at 544. Plaintiff satisfies the first, second, third, and seventh factors and the remaining factors are neutral. The Court finds that Plaintiff has sufficiently proven that its trade dress acquired secondary meaning.

The length and manner of use factor weighs in favor of secondary meaning when trade dress is marketed "for over thirty years[.]" *Unified Buddhist Church of Vietnam v. Unified Buddhist Church of Vietnam*, 838 F. App'x 809, 813 (5th Cir. 2020) (per curiam); *see Amazing Spaces*, 608 F.3d at 248 (finding ten years of use insufficient); *but see Pengu Swim Sch.*, 2023 WL 3044607, at *8 (finding nine years "provides some evidence of secondary meaning"). Plaintiff has sold bakery goods using its trade dress for at least 36 years. *See* Mot. at 1 (stating that the first use in commerce was in 1990). That is sufficient. For the volume of sales factor, the Fifth Circuit "considered the sale of items grossing $30,500 to be low volume, but has affirmed a finding of secondary meaning . . . when sales totaled $93 million." *Viacom Int'l*, 891 F.3d at 191 (citations omitted). Plaintiff's sales reach into the hundreds of millions. *See* Compl. at ¶ 18. The volume of sales factor thus weighs in favor of finding secondary meaning.

As does the third factor. "The relevant question with regard to factor three—the amount and manner of advertising—'is not the *extent* of the promotional efforts, but their *effectiveness* in altering the meaning of [the product] to the consuming public.'" *Viacom Int'l*, 891 F.3d at 191 (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th

Cir. 1983)). Plaintiff "has spent millions of dollars to promote and distribute its goods" using its "distinctive packaging," and "invested substantial time and resources in marketing." Compl. at ¶¶ 20–21. Although these assertions do not "directly prove[]" the "effectiveness of [Plaintiff's] advertising as to its [bakery goods]," the Fifth Circuit has found the third factor satisfied where "[t]he effectiveness of th[e] advertising is evident from the success of product sales[.]" *Viacom Int'l*, 891 F.3d at 191.

Consider *Viacom International* for example. There, Plaintiff Viacom used the fictional restaurant, "The Krusty Krab," which is prominently featured in the children's television show, "SpongeBob SquarePants," to promote the show and various movie adaptations of the show. *Id.* at 183. Viacom spent $197 million to promote its SpongeBob SquarePants feature films which grossed $470 million. *Id.* at 183. The Krusty Krab was featured in many of those advertisements, but Viacom never definitively linked its use of the Krusty Krab mark to its gross sales. *See id.* at 191. Nevertheless, the Fifth Circuit held that the Krusty Krab's prominence in the advertisements coupled with the gross sales were "such that the public would recognize the mark as more than an artistic backdrop," sufficient to satisfy the third factor. *Id.*

So too here. Plaintiff spent millions on advertising and has grossed over $100 million in sales. Its trade dress, including the "BON APPETIT" label, feature prominently on some of those materials. *See* Compl. at ¶ 21. Although Plaintiff did not submit any of its actual advertising content, its circumstantial evidence thus tilts the third factor at least slightly in favor of secondary meaning. *See Pengu Swim Sch.*, 2023 WL 3044607, at *9 (finding that the third factor weighed "slightly" in favor of secondary meaning by relying solely on the fact that Plaintiff spent $879,621.67 on advertising).

Factors four through six are neutral because Plaintiff does not provide evidence that newspapers or magazines used its trade dress, nor provides consumer survey data or direct consumer testimony. "[B]ut 'survey evidence is not required to establish secondary meaning.'" *Viacom Int'l*, 891 F.3d at 191 (quoting *Nola Spice Designs*, 783 F.3d at 546); *but see Pengu Swim Sch.*, 2023 WL 3044607, at *9 (holding that the absence of consumer survey data weighed against the fifth factor).

The last factor—the defendant's intent in copying the trade dress—also supports secondary meaning. "For this factor, the 'relevant inquiry is whether [defendant] intended to derive benefits from [plaintiff]'s reputation by using the [trade dress].'" *Beatriz Ball*, 40 F.4th at 319 (alteration in original) (quoting *Viacom Int'l*, 891 F.3d at 195–96). "Evidence that a defendant intends to 'pass off' its product as that of another can be found through imitation of packaging, similar distribution methods, and more." *Id.* (quoting *Viacom Int'l*, 891 F.3d at 196). Defendants' packaging is a dead ringer for Plaintiff's. And here, a picture is worth a thousand words (Plaintiff's dress on the left, Defendants' dress on the right):







(Exhibit 3)




(Exhibit 4)

Both packages use thin, translucent plastic, deploy similar color schemes for the same goods, and share label placement and shape. And the labels themselves use similar if not identical color schemes, image placement, and of course, similar sounding product names. But what draws the similarity between Plaintiff and Defendants' trade dress into perhaps starker relief is the way Plaintiff's competitors deploy packaging that is totally distinct from Plaintiff's. Again, the pictures make the point (Plaintiff's dress on the left; competitors' dress on the right):




(Exhibit 5)




(Exhibit 6)

Competitors' packaging clearly distinguishes itself from Plaintiff's in a variety of ways. They differ in color, size, shape, border design, font, label placement, and in their overall aesthetic. In Exhibit 6, the competitors even use clear plastic packaging but still distinguish themselves from Plaintiff's dress. "A competitor can use elements of [plaintiff's] trade dress, but [plaintiff] can protect a combination of visual elements that, taken together may create a distinctive visual impression." *Beatriz Ball*, 40 F.4th at 320 n.9 (alteration in original) (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1118 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992)). Nothing prevents Defendants from using certain packaging elements that Plaintiff also uses. But Defendants intent to derive benefits from Plaintiff's reputational capital is evident here because they copied "the integration of features comprising [Plaintiff's dress]." *Id.* "Ultimately, a visual comparison of [Plaintiff's] products to [Defendants'] makes it difficult to deny that there was intent to copy." *Id.* Indeed, "[t]he designs are not just alike, they are indistinguishable in some cases." *Id.* "When two product designs are so very similar, an inference of intent is permissible." *Id.* The seventh factor thus weighs in favor of secondary meaning.

All factors for which Plaintiff submits evidence weigh in favor of secondary meaning. Its trade dress created "a mental association in buyers' minds between [its trade dress] and a single source of the product," namely, Plaintiff. *Id.* at 317. Plaintiff's trade dress has secondary meaning and is distinctive. *See id.* (finding reversal and remand appropriate to reanalyze secondary meaning where the district court's analysis of the second, fourth, and seventh factors was erroneous); *Viacom Int'l*, 891 F.3d at 191 (finding secondary meaning where the first, second, third, and fourth factors were satisfied).

The Court turns to the second prong of the trade dress infringement analysis: whether "the trade dress has been infringed by demonstrating a likelihood of confusion in the minds of potential consumers." *Beatriz Ball,* 40 F.4th at 316–17. The factors of confusion support a finding of confusion. *See Pengu Swim Sch.*, 2023 WL 3044607, at *13.

The first and second factors—similarity of products and identity of retail outlets and purchasers—weigh in favor of Plaintiff as discussed above. *See supra,* Part I-A.

The third is neutral because Plaintiff produces no evidence of its advertising media.

The fourth factor favors Plaintiff because its trade dress is strong in the market for baked goods. "Generally, the stronger the [trade dress], the greater the likelihood that consumers will be confused by competing uses of the mark." *Pengu Swim Sch.*, 2023 WL 3044607, at *13 n.30 (quoting *Smack Apparel*, 550 F.3d at 479). And "[s]trength in the marketplace is demonstrated by showing 'strong established secondary meaning in the market.'" *Id.* (quoting *Am. Rice*, 518 F.3d at 331). The Court has already established that Plaintiff's trade dress acquired secondary meaning. *See supra*, Part I-B. Plaintiff, moreover, has used its trade dress for 36 years in more than 60,000 retail locations nationwide. Defendant responds that "elements like

[c]lear [p]lastic [w]rapping, common standard label positioning, and product photography are generic . . . and ubiquitous characteristics standard across the commercial baking industry." Answer at 15. "But the key is whether the third-party use diminishes in the public's mind the association of the [trade dress] with the plaintiff[.]" *Smack Apparel*, 550 F.3d at 479. And again, trade dress is not a single aspect of packaging design like clear plastic or label position. It is the "combination of visual elements that, taken together may create a distinctive visual impression." *Beatriz Ball*, 40 F.4th at 320 n.9 (citation omitted). Defendants fail to prove that those companies deploy the same unique combination of designs that compose Plaintiff's packaging and that Defendants repurpose. Defendants' evidence of third-party use is thus insufficient to overcome the ubiquity of Plaintiff's trade dress.

Factors five and six weigh in favor of Plaintiff. The parties' trade dress is so similar that it evinces an intent to copy. *See supra*, Part I-B; *Viacom Int'l*, 891 F.3d at 191 (treating "intent" analysis to assess secondary meaning as interchangeable with "intent" analysis for the confusion prong).

The seventh factor is neutral because Plaintiff presents no evidence of actual confusion. *See Smack Apparel*, 550 F.3d at 483. And the eighth factor—degree of consumer care—supports Plaintiff for the reasons explained above. *See supra*, Part I-A.

The factors and the totality of the circumstances thus point in a clear direction. Defendants' trade dress is likely to cause confusion in the minds of consumers. *See Viacom Int'l*, 891 F.3d at 198 (finding an overall likelihood of confusion where only the first, second, third, and seventh factors were satisfied); *Streamline Prod.*, 851 F.3d at 458 (upholding finding of a likelihood of confusion "[a]lthough the [factors] of confusion d[id] not point in a uniform direction" because "at least some

weigh[ed] in favor"). Plaintiff is therefore likely to succeed on the merits of its trade dress infringement claim.

## II. Remaining preliminary injunction factors

The Court only considers the remaining preliminary injunction factors for Plaintiff's trade dress infringement claim. Plaintiff failed to show that it was likely to succeed on the merits of its trademark infringement claim, so the Court need not consider the remaining factors for that claim.[2] *See Stevens v. St. Tammany Par. Gov't*, 17 F.4th 563, 576 (5th Cir. 2021).

Plaintiff has shown that it will be irreparably harmed without a preliminary injunction as to trade dress. "Under the Lanham Act, a plaintiff seeking a preliminary injunction against infringement 'shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits.'" *Whirlpool*, 80 F.4th at 546 (quoting 15 U.S.C. § 1116). Defendants fail to rebut this presumption because they provide no substantive argument other than stating their view that "irreparable injury" here "is factually impossibile and legally frivolous." Answer at 28. That is not a particularized reason why Plaintiff's harm is reparable. *See Whirlpool*, 80 F.4th at 546 (suggesting that a plaintiff's delay in bringing suit might show a lack of irreparable injury). Plaintiff has prosecuted this action with haste, and the Court finds no other reason why the presumption should be overcome.

The balance of the equities also favors Plaintiff. Defendants allege that they operate a small business out of a shared

---

[2] Had Plaintiff been likely to succeed on the merits of its trademark infringement claim, it also would have been likely to satisfy the remaining requirements for a preliminary injunction. The remaining requirements are nearly identical for trade dress and trademark infringement claims, *see Whirlpool*, 80 F.4th at 546, and Plaintiff satisfies the remaining factors on its trade dress infringement claim. *See infra* Part II.

community kitchen, and that an injunction against them would result in large financial losses. Resp. at 2–3. Even assuming so, the Fifth Circuit has held that "the balance of harms weighs in favor of [a Plaintiff when it has a] presumption of irreparable harm" and the harm to Defendants is "pecuniary in nature, and thus presumptively reparable." *Whirlpool*, 80 F.4th at 546. "And 'one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business.'" *Shenzhen Sailvan Network Tech. Co. v. Does 1-101*, No. 4:25-cv-722-JDK, 2025 WL 3732733, at *4 (E.D. Tex. Sept. 3, 2025) (cleaned up) (quoting *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008)). This preliminary injunction, moreover, does not prevent Defendant from vigorously competing with Plaintiff. Nor does it prevent Defendants from selling any of the baked goods in question. It simply prevents them from selling those goods in packaging that infringes Plaintiff's trade dress.

Lastly, a preliminary injunction is in the public interest. While "the public has an interest in encouraging commercial competition, the public also has interest in the effective enforcement of our trademark laws." *Whirlpool*, 80 F.4th at 456; *Denbra IP Holdings, LLC v. Thornton*, 521 F. Supp. 3d 677, 690 (E.D. Tex. 2021) ("The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." (citation omitted)).

* * *

Plaintiff has thus met its burden on its trade dress infringement claim, and the Court grants in part and denies in part the motion for a preliminary injunction. *See* ECF No. 4.

## Conclusion

Plaintiff's motion for a preliminary injunction is therefore GRANTED in part and DENIED in part. *See* ECF No. 4.

**1.** Defendants and each of their respective officers, directors, employees, shareholders, members, agents, representatives, parent companies, subsidiaries, and affiliates, and any person or entity acting in concert or participation with any of them who receive actual notice of this ORDER are hereby ENJOINED and RESTRAINED until further order from this Court from the following:

**a.** Producing, promoting, advertising, selling, offering to sell, distributing, shipping, or otherwise making available any products bearing or sold in connection with the complained-of packaging or any other packaging that is substantially similar to the packaging described on page three of this ORDER ("Packaging").

**2.** This ORDER shall remain in effect until the final disposition of this case as to Defendants.

**3.** Pursuant to 15 U.S.C. § 1116(a), Defendants shall file with the Court and serve upon Plaintiff's counsel, within 30 days after entry of this ORDER, a document under oath describing in detail the manner and form in which Defendants have complied with the injunction, including ceasing all offering of goods using the Packaging.

**4.** Under FED. R. CIV. P. 65(c), the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the

costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

**a.** The Court finds that a $10,000 bond would be appropriate.

**b.** It is therefore ORDERED that the Clerk of the Court receive and deposit into the Registry of the Court the amount $10,000 which represents the bond. These funds shall remain in the Registry of the Court until further order from this Court.

**c.** Here, the Court finds the amount of $10,000 to satisfy any damages from wrongful restraint. *See also Phillips v. Charles Schreiner Bank*, 894 F.2d 127, 131 (5th Cir. 1990) (finding reversible error in the district court's failure to follow Rule 65(c)). Within three calendar days of entry of this ORDER, Plaintiff shall deposit with the Court $10,000, either law firm check, cash or surety bond, as security, which amount has been deemed adequate for the payment of such damages as any person may be entitled to recover as a result of a wrongful restraint hereunder.

*So ordered by the Court on November 16, 2026.*

ANDREW DAVIS
United States District Judge